UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
ALEXIA ("ANTHONY") DASKALAKIS,                   :
                                                 :    Civil Action No.:
                        Plaintiff,               :
                                                 :
        v.                                       :    **COMPLAINT**
                                                 :
FOREVER 21, INC.,                                :
                                                 :    **Jury Trial Demanded**
                        Defendant.               :
------------------------------------------------------------- x

Plaintiff alleges against Defendant Forever 21, Inc. ("Forever 21") as follows:

**PRELIMINARY STATEMENT**

1.      On the one hand, this is a heartbreaking case about a transgender woman who was treated harshly and cruelly by her employer and ultimately was terminated after she objected to the discriminatory conduct. On the other hand, this case is symptomatic of the deeper sickness within corporate America of disenfranchising the transgender community.[1] Regrettably, Forever 21 – the popular clothing retailer – further spreads this societal illness throughout its workplace.

2.      Alexia Daskalakis, a transgender woman who was a dedicated employee of Forever 21 for approximately four years, was subject to intense ridicule, harassment and mistreatment following her decision to transition. Brazenly, Forever 21 decided it knew her gender better than she did. She was told by her manager that she was **"a hot mess," "disgusting"** looked **"offensive"** and that, **"in my eyes and in the Company's eyes, you're still a male."** Unfortunately, it is not surprising that her numerous complaints fell on deaf ears and the Company fired her rather than take any remedial action.

---

[1]     See Jaime M. Grant, Injustice at Every Turn: A Report of the National Transgender Discrimination Survey. Washington: National Center for Transgender Equality and National Gay and Lesbian Task Force, 2011 (90% of transgender employees experience workplace discrimination and transgender individuals are twice as likely to be unemployed and four times more likely to live in extreme poverty).

3. Forever 21 prints Bible verse John 3:16 ("For God so loved the world, that he gave his only begotten Son, that whosoever believeth in him should not perish, but have everlasting life") on the bottom of each of its shopping bags. Perhaps they would be better served to remind their store managers of Matthew 7:1, "Judge not, that ye be not judged."

## NATURE OF THE CLAIMS

4. Plaintiff brings this action for monetary damages, as well as for declaratory and injunctive relief, to redress the unlawful discrimination and retaliation committed against her by Defendant in violation of the New York State Human Rights Law, New York Executive Law §§ 290 *et seq.* ("NYSHRL") and the New York City Human Rights Law, Administrative Code of the City of New York §§ 8-101 *et seq.* ("NYCHRL").

## PROCEDURAL REQUIREMENTS

5. Following the commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirement of § 8-502 of the NYCHRL.

6. Following the commencement of this action, Plaintiff will file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Following her receipt of a Notice of Right to Sue, Plaintiff will file and/or seek leave to file an Amended Complaint to include claims under Title VII.

7. Any and all other administrative prerequisites have been met.

## PARTIES

8. Plaintiff Alexia Daskalakis was employed by Forever 21 from in or around May 2011 to January 23, 2015. At all relevant times, Plaintiff met the definition of an "employee" under all applicable statutes. Ms. Daskalakis is a resident of Kings County, New York.

9. Defendant Forever 21 is a foreign business corporation with its headquarters located at 3880 North Mission Road, Los Angeles, California 90031. At all relevant times, Forever 21 met the definition of an "employer" under all relevant statutes.

## JURISDICTION AND VENUE

10. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship between Ms. Daskalakis, a resident of the State of New York, and Defendant Forever 21, a corporation incorporated in California, and this action involves a matter in controversy that exceeds the sum of $75,000, exclusive of interest and costs.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## FACTUAL ALLEGATIONS

**Background**

12. Forever 21 is a California-based clothing retailer with nearly 800 locations in nearly 50 countries throughout the world. Forever 21 claims to be the fifth largest specialty retailer in the United States, employing about 30,000 employees and generating approximately $3,850,000,000 in revenue per year.

13. Many of Forever 21's products heavily promote its owners' born-again Christian sensibilities, such as t-shirts that read "Thank God," "Jesus Loves You," "Holy," and "Love Peace Faith Hope Jesus."

14. Indeed, every Forever 21 shopping bag has the words "John 3:16" printed on the bottom, in reference to the biblical verse "For God so loved the world, that he gave his only begotten Son, that whosoever believeth in him should not perish, but have everlasting life."

15. Forever 21 claims a commitment to charitable causes, yet none of these causes include an LGBT focus.

16. In or around May 2011, Defendant hired Ms. Daskalakis to work as a Sales Associate in Defendant's store located at 5301 Kings Plaza, Brooklyn, New York.

17. Ms. Daskalakis worked for a few months as a Sales Associate before being promoted to the position of Visual Merchandiser.

18. As a Visual Merchandiser, Ms. Daskalakis was responsible for putting up displays in the store, displaying new products, dressing the mannequins and performing other similar tasks related to the appearance and look of the store.

19. Ms. Daskalakis's performance was always excellent, as evidenced by the fact that she consistently garnered positive end-of-year reviews, regularly received performance bonuses and raises, and became one of the most tenured employees in the store.

20. In fact, during Ms. Daskalakis's tenure at Forever 21, there was an enormous amount of turnover, both among her coworkers and management. By 2013, of the approximately 75 to 100 employees working at the store, only 10 to 15 had worked there as long as Ms. Daskalakis.

21.     In or around October 2013, Defendant hired a new Visual Manager, Patrick Walmsley, who would become Ms. Daskalakis's direct supervisor.

**Ms. Daskalakis's Transition and Discrimination Against Her**

22.     Ms. Daskalakis was assigned male gender at birth, but knew from a young age that she identified as female.

23.     In or around January 2014, Ms. Daskalakis began transitioning to present as a woman.

24.     For instance, but only by way of example, Ms. Daskalakis began dressing in a more traditionally feminine manner, such as wearing more form-fitting clothing and applying more traditionally feminine makeup.

25.     When Ms. Daskalakis informed Mr. Walmsley that she would be transitioning to present as a woman, he told her to "**make sure it [didn't] affect [her] work.**" Comments like these became commonplace as Ms. Daskalakis began her transition.

26.     This response from Mr. Walmsley was loaded with subtext, given his previous statements to other women under his supervision, whom he told "**don't get pregnant, because if you can't work, you'll get fired.**"

27.     Ms. Daskalakis found these comments offensive as there was no suggestion or reason to believe that whether she presented as a man or a woman would have any impact on her work, which had always been of a very high quality. Clearly, Mr. Walmsley felt that a transgender employee would create problems in the workplace.

28.     It quickly became apparent to Ms. Daskalakis that even though she was able to continue to perform her job at her regular level, Mr. Walmsley was not comfortable with her transitioning and would use his position of authority to discriminate against her.

29. After Ms. Daskalakis disclosed her plans to begin transitioning, Mr. Walmsley began treating Ms. Daskalakis with increasing contempt. This dramatic change in his attitude towards her included, but was not limited to, cursing at her in front of coworkers (for instance, often telling her to "shut the fuck up") and calling her "useless."

30. Throughout the months following the disclosure of her plans to transition, Mr. Walmsley's treatment of Ms. Daskalakis got precipitously worse and more pervasive. Nonetheless, Ms. Daskalakis continued to perform her job at her normal high level, despite the abuse she was now receiving from Mr. Walmsley.

31. In or around August 2014, Ms. Daskalakis informed Mr. Walmsley that she would soon begin taking hormones to physically transition her body to present as female.

32. Given the manner in which Mr. Walmsley treated her after she initially told him about her transitioning plans, Ms. Daskalakis was rightfully concerned that he would treat her even worse once her transition started taking a more physical form.

33. Ms. Daskalakis, out of an abundance of caution, told Mr. Walmsley that her doctor had informed her that one of the side effects of the hormone treatment was the possibility of severe pain in her back and hands, which could prevent her from handling the mannequins in some circumstances and/or at certain times.

34. Ms. Daskalakis assured Mr. Walmsley that even if these side effects occurred, she would do her best and the rest of her responsibilities would be unaffected. Moreover, Ms. Daskalakis informed him that she would still be able to work with the mannequins as long as she was properly accommodated, such as receiving some help from a fellow employee.

35. Once again, Mr. Walmsley ominously warned Ms. Daskalakis that she had better "**make sure that it doesn't affect your job,**" and that "**if you can't do everything I say you should do, you will be fired.**"

36. Later in August 2014, Ms. Daskalakis and a number of other Visual Merchandising employees stayed at the store overnight in order to remodel.

37. Mr. Walmsley was present, as was the District Manager, Asher Shaheen.

38. On this occasion, the store was over 90 degrees Fahrenheit, and many of the female employees were wearing shorts and crop-tops in order to stay cool. Ms. Daskalakis was wearing the same outfit.

39. Despite the fact that there was no dress code enforced overnight – in large part because there were no customers present during those hours – Mr. Shaheen instructed Mr. Walmsley to tell Ms. Daskalakis that her outfit was offensive to him and to the other employees.

40. Mr. Walmsley told Ms. Daskalakis: "**Asher finds your outfit offensive to him and to other employees.**"

41. Upon information and belief, not a single employee had complained to anyone about Ms. Daskalakis's outfit.

42. In response, Ms. Daskalakis stated that she was wearing the same outfit as all of the other women and reminded him that she was transitioning.

43. Mr. Walmsley replied that Mr. Shaheen thought she was "**disgusting.**"

44. Mr. Walmsley also stated that "**Asher doesn't care. You're still a male, so you need to abide by the male dress code**" and reiterated that she was "**disgusting.**"

45. Mr. Walmsley then insisted that Ms. Daskalakis either cover herself up or buy a new outfit.

46. Deeply hurt, embarrassed and insulted by Mr. Walmsley and Mr. Shaheen singling her out and discriminating against her, Ms. Daskalakis decided to defuse the situation by tying a coworker's flannel shirt around her waist and went back to work.

47. A couple of months later, in or around November 2014, Mr. Shaheen visited the store once again while Ms. Daskalakis and her coworkers were doing an overnight inventory.

48. A coworker, Diana, overheard Mr. Shaheen say to Andy, the store manager, **"What are we going to do with this hot mess?"** clearly referring to Ms. Daskalakis.

49. The next day, Ms. Daskalakis approached Mr. Walmsley to tell him that she felt very uncomfortable with Mr. Shaheen's comments about her appearance and the fact that she presented as a woman.

50. Mr. Walmsley defended Mr. Shaheen, stating **"he [was] just getting used to people being gay, but this is totally different. He's not used to guys becoming girls."**

51. The following day, Ms. Daskalakis called Forever 21's Human Resources Department ("HR") to report the discriminatory treatment to which she was being subjected at the hands of both her immediate supervisor, Mr. Walmsley, and her District Manager, Mr. Shaheen.

52. However, the phone simply rang twice and then hung up on Ms. Daskalakis.

53. In or around late November to early December 2014, Ms. Daskalakis arrived at work wearing jeans, a crop-top and a leather jacket.

54. Despite having been through this before, Mr. Walmsley approached Ms. Daskalakis and asked whether she was going to cover up.

55. Ms. Daskalakis responded that she intended to wear the jacket over her top.

56. Mr. Walmsley said that she could not wear the leather jacket, nor could she wear the crop-top and instructed Ms. Daskalakis to go to the back office and read the Company's dress code.

57. Ms. Daskalakis did so and found that the dress code made no mention of leather jackets or crop-tops, but prohibited "indecent skin" and "winter jackets."

58. Ms. Daskalakis informed Mr. Walmsley of her findings and asked why her outfit was considered "indecent," particularly when a female coworker who was also present at the store was wearing jeans, a crop-top and a leather jacket – nearly identical articles of clothing – and was not reprimanded or told to change.

59. Mr. Walmsley told Ms. Daskalakis that she was being treated differently because **"you're a guy, and you're showing more skin."**

60. Ms. Daskalakis told Mr. Walmsley that she was showing the same amount of skin as her coworker, who was not being sent home or harassed for her attire.

61. Mr. Walmsley then again exhibited his discriminatory attitude by stating:

> **"The male dress code is different from the female dress code, and you're still a male until you change your birth certificate."**

62. When Ms. Daskalakis pointed out that for nearly a year she had been presenting as a woman, identifying as a woman and that all of her coworkers referred to her as a woman, including using female pronouns to refer to her, Mr. Walmsley appallingly countered:

> **"In my eyes and in the Company's eyes, you're still a male."**

63. Mr. Walmsley then sent Ms. Daskalakis home for the remainder of the work day.

64. In late December 2014, having failed to get help from Mr. Walmsley or HR, Ms. Daskalakis approached Andy, the store manager and Mr. Walmsley's direct supervisor, about the way she had been treated by Mr. Walmsley.

9

65. Like every other managerial-level employee, Andy failed to offer any assistance to Ms. Daskalakis whatsoever, merely putting her off day after day.

66. Finally, all of Mr. Walmsley's hostility toward Ms. Daskalakis came to a head in or around late December 2014.

67. Mr. Walmsley instructed Ms. Daskalakis to move all of the clothing items off of a table so that the table could be moved. Ms. Daskalakis complied.

68. Mr. Walmsley noticed that there were three small items left on the table and, rather than move the items or place them elsewhere, Mr. Walmsley literally threw the items onto the ground and aggressively and condescendingly ordered Ms. Daskalakis to pick them up.

69. Shocked that she would be treated so disrespectfully, Ms. Daskalakis told Mr. Walmsley that she did not expect to be treated in that manner at work.

70. Mr. Walmsley, losing control, shouted: **"I don't care! I'm running the show!"**

71. Mr. Walmsley then went on to scream at Ms. Daskalakis to "**shut the fuck up**," told her to "**pick it up or go home**," called her "**useless**," and, most egregiously, stated:

> **"You used to be a hard worker when you were a guy, but not anymore!"**

72. Only a couple of weeks later, Ms. Daskalakis was scheduled to work the same shifts as she had the week before, which included a 9:00 AM to 3:00 PM shift on Thursday, January 15, 2015.

73. However, Mr. Walmsley told Ms. Daskalakis that she would not be starting work on Thursday at 9:00 AM, and that he would be changing her schedule shortly.

74. Ms. Daskalakis checked her schedule daily, which Mr. Walmsley never changed, so her schedule still said that she would be working from 9:00 AM to 3:00 PM on Thursday when she left work on Wednesday afternoon.

75. Early Thursday morning, before Ms. Daskalakis's scheduled 9:00 AM shift, Ms. Daskalakis received a call from a coworker asking where she was.

76. When Ms. Daskalakis replied that she was not scheduled to work until 9:00 AM, the coworker told her that somebody had crossed out on the schedule the start time of 9:00 AM in red pen and had replaced it with 6:00 AM.

77. Ms. Daskalakis got to work that day in time for her 9:00 AM shift and was written up for being three hours late to work.

78. Once again, Ms. Daskalakis called HR to report her mistreatment, only to be transferred to the wrong department.

79. Ms. Daskalakis then called HR back, but nobody answered this time, and Ms. Daskalakis was forced to leave a voicemail which, predictably, was never returned.

80. The next week, on January 23, 2015, Ms. Daskalakis was fired.

81. Ms. Daskalakis's termination was the culmination of the discriminatory treatment she was subjected to on account of transitioning to become a woman and the retaliatory treatment she was subjected to after she complained about discrimination.

## FIRST CAUSE OF ACTION
**(Discrimination and Harassment in Violation of the NYSHRL)**

82. Plaintiff hereby repeats and realleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

83. By the actions described above, among others, Defendant has discriminated against Plaintiff on the basis of her gender, gender expression, gender identity and/or failure to conform to gender stereotypes in violation of the NYSHRL by denying Plaintiff the same terms and conditions of employment available to other employees, up to and including the termination of her employment.

11

84. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, as well as emotional harm and distress, for which she is entitled to an award of monetary damages and other relief.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)

85. Plaintiff hereby repeats and realleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

86. By the actions described above, among others, Defendant has retaliated against Plaintiff for her engagement in protected activities in violation of the NYSHRL by denying Plaintiff the same terms and conditions of employment available to other employees, up to and including the termination of her employment.

87. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, as well as emotional harm and distress, for which she is entitled to an award of monetary damages and other relief.

## THIRD CAUSE OF ACTION
### (Discrimination and Harassment in Violation of the NYCHRL)

88. Plaintiff hereby repeats and realleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

89. By the actions described above, among others, Defendant has discriminated against Plaintiff on the basis of her gender, gender expression, gender identity and/or failure to conform to gender stereotypes in violation of the NYCHRL by denying Plaintiff the same terms

and conditions of employment available to other employees, up to and including the termination of her employment.

90. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, as well as emotional harm and distress, for which she is entitled to an award of monetary damages and other relief.

91. Defendant's unlawful actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

92. Plaintiff is also entitled to an award of attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)

93. Plaintiff hereby repeats and realleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

94. By the actions described above, among others, Defendant has retaliated against Plaintiff for her engagement in protected activities in violation of the NYSHRL by denying Plaintiff the same terms and conditions of employment available to other employees, up to and including the termination of her employment.

95. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, as well as emotional harm and distress, for which she is entitled to an award of monetary damages and other relief.

96. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or

economic harm, as well as emotional harm and distress, for which she is entitled to an award of monetary damages and other relief.

97. Defendant's unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

98. Plaintiff is also entitled to an award of attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate New York state and local laws;

B. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for her emotional harm and distress;

D. An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E. An award of punitive damages;

F. An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and,

G. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: April 1, 2015
       New York, New York

Respectfully submitted,

WIGDOR LLP

By: _____
     David E. Gottlieb
     Brian A. Bodansky

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dgottlieb@wigdorlaw.com
bbodansky@wigdorlaw.com

*Counsel for Plaintiff*